Harley Alexander v. Commissioner. Maude Alexander v. Commissioner.
Alexander v. Commissioner
Docket Nos. 16573, 16574, 18923, 18924. *
United States Tax Court
1950 Tax Ct. Memo LEXIS 211; 9 T.C.M. (CCH) 356; T.C.M. (RIA) 50105; April 21, 1950
*211 Arthur Glover, Esq., and Walter G. Russell, C.P.A., Amarillo Bldg., Amarillo, Tex., for the petitioners. Donald P. Chehock, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: These proceedings involve deficiencies in income taxes for each petitioner of $5,445.68 for 1943 (the year 1942 is involved because of the applicability of the Current Tax Payment Act of 1943), and deficiencies in income taxes for 1944 of $4,177.48 and $3,920.77 for the petitioner Harley Alexander and Maude Alexander, respectively. Certain issues have been eliminated by stipulation which will be reflected in decisions to be entered under Rule 50. The only questions remaining for our determination are: (1) Did the Commissioner err in his determination that 45 per cent of the profits from the partnership of Alexander & Alexander, reported by petitioners' daughter Mary for the years 1942, 1943, and 1944, was community income of the petitioners; (2) did the Commissioner err in his determination that the income reported by the daughter Frances for the years 1943 and 1944 was taxable community income of the petitioners, except for a dependency exemption each *212 year. The proceedings were consolidated for hearing. From evidence both documentary and oral, we make the following Findings of Fact The petitioners, Harley Alexander and Maude Alexander, are husband and wife, residing on a ranch in Hansford County, Texas. They have three children, Mary, born December 2, 1920, Frances, born September 21, 1928, and one son, David, younger than his sisters. Petitioners filed their tax returns for the years in question with the collector of internal revenue for the second district of Texas, at Dallas. For the purpose of simplification, the use of the word "petitioner" in the singular will refer to the petitioner Harley Alexander. At a time not shown Robert Alexander and petitioner, his brother, agreed to enter into a partnership for operating about 1,800 acres of farm land and 1,000 acres of grass land, provided they could get a man to run the operation. One Albert Moen was contacted, and he agreed to handle the farming and cattle operation. All capital was to be furnished by petitioner and Robert Alexander. After petitioner's and Robert Alexander's investment had been returned to them the interest of the partnership was to be divided, as follows: *213 45 per cent each, petitioner and Robert Alexander, and 10 per cent to Moen. The partnership was known as Alexander & Alexander, and was engaged in farming and cattle business. At the time of the formation of this partnership, Robert Alexander did his banking at the First State Bank at Stratford, and petitioner was transacting his banking business at the First State Bank at Spearman. The partnership opened its bank account at the First State Bank of Stratford under the name of "Harley Alexander." The idea was that books would not have to be kept, and that the money there would belong to the partnership. Cash deposits were made by petitioner and Robert Alexander in 1940 and 1941 in the amount of $5,800. The first crop was put in by the partnership in 1940. The first cattle were purchased in January 1941 for $6,357.82. During August 1941, the partnership purchased 133 head of cattle at Oklahoma City for $6,311.42. Petitioner and Robert Alexander each paid half the amount. During December 1941 the partnership sold 133 head of cattle for $14,113.36. Alexander & Alexander showed a loss from farming operation for 1940 and 1941, in the amounts of $4,723.24 and $222.69, respectively, but *214 showed a profit for the same period from their cattle operation of $7,374.08, making a net gain for the two years of $2,428.15. The $14,113.36, selling price of the aforementioned cattle, was deposited in Robert Alexander's bank account. On the date of the deposit of the $14,113.36 in Robert Alexander's account, December 23, 1941, Robert Alexander drew one check for $500, to the order of "Harley Alexander," and another for $500, to the order of "Deposit to Harley Alexander." These two checks were deposited in petitioner's account at the Stratford Bank. Robert Alexander drew a third check on the same day to the order of "Harley Alexander" for $6,806.68, with the notation "cattle sold at Kerrick 133 head," which was deposited in petitioner's bank account at Spearman. Shortly after the formation of the partnership the petitioner purchased a section of land adjoining the land operated by the partnership. The land was purchased for $6 an acre, of which the petitioner paid one dollar down. About April 1940 petitioner told Robert that he believed he would buy the land for Mary and "said he believed if we had any luck that this farming operation would pay for itself and as soon as he could *215 get his money back out of the initial investment, why, he was going to give his interest to Mary" if it was all right with Robert, and Robert told him it was. About the spring of 1940 petitioner told H. B. Hart that as soon as he could get his money out of the deal with Robert he was going to turn it over to Mary. A wheat crop made enough money to make the first payment. The petitioner, later, paid an additional one dollar an acre on the land. This land was rented to the partnership from the time petitioner acquired it, and rents thereafter were paid to the petitioner and later to Mary. [1] Petitioner and his wife Maude executed a deed to this section of land to their daughter Mary under date of July 3, 1942, recorded January 15, 1943. On May 16, 1941, Mary signed a note with the First State Bank at Spearman for $3,127.77, giving as security a one-half interest in 133 steers belonging to Alexander & Alexander. The loan was made for the petitioner, and the petitioner got the money. The petitioner later repaid the loan, $1,982.94 of the amount *216 being paid by a check drawn on the partnership bank account by petitioner under date of January 22, 1942. On December 25, 1941, petitioner's daughter Mary, then 21 years of age, became engaged to be married to Walter M. Hart. On January 22, 1942, the partnership of Alexander & Alexander owned two tractors and one plow, valued about $1,500. On January 22, 1942, Robert Alexander and Mary signed a note at the First State Bank of Spearman for $7,210, and $7,000 of the amount was deposited in the account of Alexander & Alexander in that bank. On the same day the following checks were drawn against the partnership's bank account: Payee
Amount
Signer of check
(1) Robert Alexander
$ 355.56
Alexander & Alexander, Harley Alexander
(2) Robert Alexander
3,155.71
Alexander & Alexander, Harley Alexander
(3) Harley Alexander
1,164.87
Alexander & Alexander, by Robert Alexander
(4) First State Bank, Spearman,
1,982.94
Alexander & Alexander, Harley
Texas
Alexander The following notations appeared on the checks: (1) "Less 225 pd Robert Alexander is to be refunded" (The back of the check has many items which appear to be amounts paid out for labor, the sub-total *217 amount of which is $130.56, and another notation below the sub-total, "Combine $225.00," making the total $355.56); (2) "1/2 of 133 cattle Okla. City"; (3) "Bal. on 1/2 of cattle bought at Oklahoma City"; (4) "Mary's note." Robert told Albert Moen and Robert's nephew David McBryde that Mary was a partner in the business. Mary had learned, when Alexander & Alexander was formed, that she might receive an interest in it. The books kept for Alexander & Alexander did not show Mary as a partner until 1944, except that for 1943 they show division of company money, with $3,600 to Mary. For 1942 and 1944 the books show "Alexander & Alexander Partnership report" [2] as a heading on one page, and, for 1944, "Robert Alexander 45% Mary Hart 45% Albert Moen 10%" as a heading on another page, and show company money divided, $6,000 to Mary. The books covering 1940 to 1944, inclusive, consist of seven sheets. No capital accounts for partners are shown, except indication of distributions as above. No capital contributions by partners are shown. The sheets were made up the latter part of each year. On March 7, 1942, Mary *218 was married to Walter M. Hart. From March until June of 1942, Mary was with her husband at College Station, Texas. Thereafter and until May 1943, except for occasional visits at home, she was with her husband at Army camps located in the United States. (In May 1943, her husband went overseas and was later killed while in the service.) During the school years of 1943 and 1944, and 1944 and 1945, Mary was in Amarillo, Texas, with her sister Frances. Mary and Frances returned to their parents' home in Hansford County on many week-ends. They also spent their summer vacations with their parents. During the years in controversy, petitioner and Robert Alexander drew checks on various bank accounts in payment of their personal expenses as well as the expenses of the partnership. Some examples of checks drawn by Harley Alexander on the Alexander & Alexander bank account are, as follows: Date
Payee
Amount
(1) 6- 2-42
H. L. Wilbanks
$ 8.34
(2) 11- 1-42
E. L. Leighton
5.00
(3) 11- 1-42
L. R. Searlott
10.05
(4) 11- 3-42
W. T. Martin
15.63
(5) 1-20-43
Texas County
Motor Co.
8.24
(6) 6- 9-43
W. T. Martin
93.30
(7) 10-25-43
L. K. Garrett
3,131.17
(8) 1-29-44
R. L. McCellan
Grain Co.
465.10
(9) 3-18-44
Lewis Philipps
25.00
(10) 10- 7-44
T. L. Moulton
105.00
*219 These checks were written for the following reasons: (1) For license on truck owned by petitioner. (H. L. Wilbanks was tax collector of Hansford County.) (2) For pasture. (3) For inspection of 201 cattle. (4)For repairs for Alexander & Alexander. (5) For truck axle for Alexander & Alexander. (6) For repairs incurred by Moen, billed to petitioner. (7) For 73 cattle purchased by Alexander & Alexander, received by the petitioner at Gruver. (8) For a car load of hay used by Alexander & Alexander, petitioner, McBryde, and Robert Alexander. (9) For labor for unloading feed. (10) For one cow. Albert Moen wrote most of the Alexander & Alexander checks, in general paid the bills, and was supposed to pay all expense accounts, except cattle purchased "and probably feed that we bought and ordered." In 1942 the petitioner supervised the cutting of the wheat for Alexander & Alexander, and in connection therewith wrote the following checks on the partnership bank account: Date
Amount
For
7-18-42
$400.00
Cutting wheat
7-18-42
47.50
Cutting wheat
7-23-42
22.83
Repairs
7-28-42
28.00
Labor
7-28-42
28.00
Labor
The only cattle sold in 1942 were *220 127 steers (purchased at Oklahoma City the year before) for $17,944.88. [3] The cattle were shipped to Kansas City. Robert Alexander was present when the first shipment was made and they were billed out in his name. Robert Alexander received payment for this shipment in the amount of $7,250.16 [3] The remainder were shipped later and Moen billed them out in petitioner's name. Petitioner received payment for this shipment in the amount of $9,694.72. [3] The two checks were deposited to the partnership bank account. In 1943 Alexander & Alexander sold for $25,050.39 cattle costing $13,059.69. A bank account was opened for Mary at the First State Bank at Spearman on December 31, 1942, with a deposit of $981.64. During the period between December 31, 1942, and September 22, 1943, both inclusive, there was deposited to her account a total of $7,170.69. The checks written on the account are, as follows: Date
Payee
Check written by
Amount
For
1- 6-43
H. D. Foust, Tax Col.
Robert Alexander
$ 47.07
Taxes on
Sec. 9,
Dallam Co.
3-31-43
Dalhart National Farm & Loan Ass'n.
Harley Alexander
362.81
4-27-43
Col. of Int. Rev.
C. A. Gibner [4]
171.83
Fed income
taxes
6-12-43
Dalhart National Farm & Loan Ass'n.
Harley Alexander
2,000.00
Payment on
principal
Loan # 4323
8-11-43
Dalhart National Farm & Loan Ass'n.
Mary
2,686.05
Loan #4323
paid in full
9-22-43
First State Bank
Harley Alexander
750.00
Bond
*221 On September 22, 1943, the account had on deposit an amount of $1,152.96. Mary performed during 1942, 1943, and 1944 no services for Alexander & Alexander. During the year 1944, Alexander & Alexander sold two groups of cattle and participated in a trade of another. The partnership sold 55 steers in October for $6,033.35 and 54 steers in December for $5,967.50. During November the partnership entered into a cattle trade with H. B. Hart in which the partnership realized a gain of $175. The petitioner purchased 23 head of cattle from the Guymon Sales Co. and gave Alexander & Alexander's check signed by him in payment therefor in the amount of $1,439.43 under date of October 5, 1944. The partnership had 20 steers on hand at the end of 1944. In the fall of 1944, Alexander & Alexander borrowed a total of $5,000 from Mary's bank account. This money was repaid by December 1944. Alexander & Alexander reported net income of $15,928.94 on their partnership return for 1942 but made no distribution of profits that year. Mary reported Federal income of $7,168.02 from Alexander & Alexander for 1942. In 1943, the Alexander & Alexander *222 partnership return showed net profits of $7,412.59. Distributions were made, as follows: Date
Payee
Check Signed by
Bank Account
Amount
(1) 7-28-43
Robert Alexander
Robert Alexander
Alexander & Alexander
$1,800
(2) 8- 5-43
Mary
Harley Alexander
Alexander & Alexander
1,800
(3) 9-22-43
Mary
Harley Alexander
Alexander & Alexander
1,800
(4) 2- 9-41
Robert Alexander
Robert Alexander
Alexander & Alexander
1,800
(5) 4- 1-44
Albert Moen
Robert Alexander
Alexander & Alexander
400 Explanation of (2) and (3) above: Those checks were not endorsed, but deposited in Mary's bank account at the First State Bank at Spearman. Mary reported $3,335.67 from Alexander & Alexander in her return for 1943. In 1944 the Alexander & Alexander partnership return showed net profits of $17,712.96. Distributions were made, as follows: Date
Payee
Check Signed by
Bank Account
Amount
(1) 3-22-44
Mary
Harley Alexander
Alexander & Alexander
$2,000.00
(2) 4-11-44
Mary
Harley Alexander
Alexander & Alexander
3,000.00
(3) 4-22-44
Albert Moen
Robert Alexander
Alexander & Alexander
1,333.33
(4) 4-24-44
Robert Alexander
Robert Alexander
Alexander & Alexander
6,000.00
*223 Explanation of (1) and (2) above: These checks were not endorsed but deposited in Mary's bank account. Since Mary and Frances were small children they had performed services of the average ranch-reared child to their parents' business. Petitioners wanted to keep Frances interested in the ranching and farming business. Frances was 15 years of age on September 21, 1943. From September 1943 to May 1945, she was living with her sister, Mary, in Amarillo, except for week-end visits home, and the summer vacation period. During 1943, petitioner turned over to Frances two tracts of rented land, one containing 86.1 acres and the other containing 132 acres. The land-owner of these tracts was notified that the land had been turned over to Frances. Petitioner furnished the seed and equipment to plant this land. It furnished wheat pasturage. While at home, Frances helped petitioner, as the other children did, from 1942 on, drill wheat, drive, and brand cattle. She did little plowing. The harvesting of all wheat was hired. AAA applications, signed by petitioner, showed Frances the operator of these tracts for 1943 and 1944. A separate brand was used for the cattle claimed to be those of *224 Frances. The first deposit made to Frances' bank account was made December 30, 1944, in the amount of $4,125 (check from Hart-Higgs Grain Co. for "3000 bu. wheat" as shown by deposit slip). In the year 1942 or 1943, petitioner purchased some cattle and branded them with the brand registered in Frances' name. The petitioner sold 79 head of these cattle for $8,945 during 1943. The cost attributable to the cattle sold was $4,526.70. The Federal income tax return filed for Frances (signed by Harley Alexander) reported income tax net income of $4,413.30. [5] Frances' Federal income tax return for 1944 reported $4,800.57 net profit from farming and stock business. Petitioner sold 25 head of cattle during 1944 for $2,919.25. The cost attributable to these cattle was $1,432.50. This amount was included in the amount reported by Frances on her 1944 Federal tax return. Also included was $4,110 from grain, $103.82 agricultural program payments, and $900 expenses for machine hire. *225 During the years in controversy, the petitioner ran from 500 to 800 head of cattle on their ranch. Hired hands were employed to assist in the operation of the petitioner's farming and ranching interests; these hired hands were paid a salary, and some had interest in cattle and wheat raised on the land controlled by the petitioner. The tax records of Hansford County show no real or personal property assessments in the name of Mary Alexander, Mrs. Walter Hart, or Frances Alexander, and there were none, for 1941, 1942, 1943, or 1944. Frances gave her father no notes. She had no money prior to the deposit on December 30, 1944. Petitioner collected from other sales, the money he furnished to buy cattle for Frances. The record fails to show that the income attributed to Mary Alexander, as a partner in Alexander & Alexander, was not earned by the petitioner, and fails to show that Mary Alexander, Robert Alexander, and Albert Moen in good faith entered into partnership. The evidence fails to show that Frances Alexander earned the income attributed to her, and that it was not the income of petitioner. Opinion Two problems are posed to us in this matter, first as to whether a partnership *226 included the petitioner, or on the other hand his daughter Mary, and second as to whether he, or his daughter Frances, earned certain income. We will examine first the question as to Mary. Was she, and not the petitioner as in effect determined by the Commissioner, a partner in the firm of Alexander & Alexander? The question is one of fact and has entailed the careful examination and analysis of much detailed evidence, oral and documentary. The essential problem is whether the petitioner in fact continued to earn the income involved, after the alleged formation of partnership between Mary, Robert Alexander, and Albert Moen, since the Commissioner determined that petitioner's arrangement with Mary "represented only a gift of future income." In short, did petitioner retire from and Mary become a part of Alexander & Alexander on January 22, 1942, as is petitioner's theory? In approaching this question we note first that there is no contention of any written agreement of partnership, and that there is no evidence whatever of agreement of dissolution of partnership between petitioner, Robert, and Moen, or of formation by oral agreement of a partnership between Mary, Robert, and Moen. *227 There was no written transfer of petitioner's partnership interest to Mary. The most that can be found in the record is testimony that petitioner had, about the start of his partnership with Robert, told Robert, in connection with purchasing the section of land later deeded to Mary, that he would buy the land for Mary "and he said he believed if we had any luck that this farming operation would pay for itself and as soon as he could get his money back out of the initial investment, why, he was going to give his interest to Mary, if it was all right with me [Robert], and I told him, 'Well, it is all right with me'." This evidence helps us little for it is indefinite whether it refers to the land, or the partnership interest, in fact sounds like reference to the land, which was in fact deeded to Mary after it had paid petitioner's initial investment. Also, petitioner told H. B. Hart, about 1940, that he was going in with Robert on the deal, and as soon as he could get his money out of it he was going to turn it over to Mary. Robert told Albert Moen, and David McBryde, Robert's nephew, that Mary was a partner. Notice to no one else appears. Mary learned that she might receive an interest *228 in Alexander & Alexander when that firm was formed. Nothing of record herein shows that Robert, Mary, and Moen ever had an agreement, oral or otherwise, to be partners. Though petitioner and Mary both testified, neither said anything of any agreement, or any intent, to form a partnership. The record is devoid of testimony that the parties intended in good faith to become partners in the conduct of business, within the thought of Commissioner v. Culbertson, 337 U.S. 733. Partnership in this case must depend upon inference of agreement, for no agreement, even oral, or even mutual intent to be partners, is the subject of testimony. Such inference, it is in effect contended, arises in the main from the testimony of Robert that Harley turned his interest over to Mary, and that "we started anew when she went into the company," from the fact that the partnership records, for 1942 and 1944, bear a heading "Alexander & Alexander partnership report" and that the records show, as to 1943 and 1944, distribution of moneys to Mary along with Robert Alexander and Moen, and, for 1944, show in a heading, "Mary 45%." That Mary received a share is undoubted, but, of course, does not of *229 itself establish partnership or meet the presumption that the Commissioner was correct in his view that petitioner earned the amounts received by her. Mary did not by her efforts earn the income. There is no contention that she contributed any services to the partnership. Petitioner's position is, as summarized on brief, that Mary, with Robert and Moen, was an owner of the firm Alexander & Alexander, and that a partner may transfer his interest so as not thereafter to be taxed thereon "whether or not the transferee thereafter renders substantial services to the business of the partnership." But, assuming the actuality of gift by petitioner to Mary of the capital which he had in the partnership with Robert and Moen, that alone is not sufficient to prove partnership by Mary with these two. Commissioner v. Culbertson supra; Herman Feldman, 14 T.C. 17 (promulgated January 11, 1950). The petitioner, on the matter of transferring partnership interest, cites Simmons v. Commissioner, 164 Fed. (2d) 220; Kent v. Commissioner, 170 Fed. (2d) 131; Clifford R. Allen, Jr., 12 T.C. 227. We, therefore, examine those cases. The Simmons *230 case, primarily relied upon and discussed, is distinguished at once from the instant matter for this reason: The court pointed out that "Following the transfer [of partnership interest] the taxpayer had no vestige of right or control in the partnership, and it is undisputed that he in fact exercised none." ( Italics supplied.) Here perhaps the principal dispute is as to whether the petitioner, after the alleged formation of the new partnership, continued to exercise such control as to justify treating him as taxable earner of the income. With such difference it is apparent that the Simmons case is not helpful here. It is to be noted also that in the Simmons case there is no doubt about transfers to wives, agreement forming the new partnership, bill of sale of property to new partnership, the notification of the public thereof, registration of the partners' names as by law required, and filing of gift tax returns. The petitioner here seems to think that in the Simmons case the court considered that the mere transfer made the wives partners in the new partnership. Such conclusion is to be read only in the light of the new agreement of partnership, for without agreement there is no *231 partnership. Here the question is whether there was such agreement. Kent v. Commissioner, supra, need not be discussed, for it merely involved gift of corporate stock to a wife, who used it in going into a partnership and the court concludes that the real test is the actuality of intention to become partners. That is the question here. Clifford R. Allen, Jr., supra, was another case of transfer of corporate stock to a wife, who went into a partnership of which the petitioner-husband was not a member and where he exercised no control. On this point, James Yiannias v. Commissioner, 180 Fed. (2d) 115 (February 14, 1950), though not altogether parallel in fact with this matter, is in principle helpful, for there though a husband assigned in writing to his wife his capital contribution to a going partnership, the contribution continued to be that of the husband, there was no new agreement of association, and she had no contract with the other partners and contributed no services, and he continued in control; he was, therefore, held taxable on the partnership profits. In Earp v. Jones, 131 Fed. (2d) 292, the husband conveyed a half *232 interest in his insurance business to his wife, who released any claim to his estate. They entered into an agreement to conduct the business. She took no part in the management. It was held that the husband was taxable upon the partnership income. Without contract, there is no basis upon which a person may be held liable as a partner, in the absence of facts creating estoppel or partnership by implication of law. "* * * according to the generally accepted rule, where no question of estoppel is involved, persons can not be held to be partners as to third persons in the absence of or in disregard of their intent as to the formation of the relation * * *." 47 C.J. 688. In Petition of Williams, 297 Fed. 696, 702, we find: "It has been said, and no doubt wisely, that it is not prudent to define a partnership; but there are certain things generally recognized as essential which may be stated, and they are probably nowhere better stated than by Judge Cooley in Beecher v. Bush, 45 Mich. 188, 200, 7 N.W. 795, 799 (40 Am. Rep. 465), where, after reviewing the cases generally, he says: 'Except when one allows the public or individual dealers to be deceived by the *233 appearances of partnership when none exists, he is never to be charged as a partner unless by contract, and with intent he has formed a relation in which the elements of partnership are to be found. * * *'" There need not be express contract, written or oral, "* * * yet in every case in which a partnership is created there must be an agreement and a meeting of the minds of the parties." 40 Am. Juris. 140. We have here no question of estoppel binding petitioner to partnership. In the absence of either written or oral agreement of partnership between Mary and the two men, Robert and Moen, may we reasonably infer such agreement? Can it be found in "contract, and with intent" under the facts here? The three parties are never shown to have met to form a partnership or to discuss their rights and liabilities. Under the evidence, it was not until the latter part of 1944 that the expression "Robert Alexander 45% Mary Hart 45% Albert Moen 10%" on the heading of a page for 1944 was set down. They had no meeting of the minds. We have, therefore, searched the record to ascertain whether agreement should be inferred, contrary to the Commissioner's conclusion. After such study, it is our opinion *234 there is no reasonable logical basis for holding that Mary supplanted the petitioner as partner in Alexander & Alexander, and that she, and not he, earned the income involved here. The respondent, as evidence that the petitioner continued to earn such income, points to a considerable number of checks written by him upon Alexander & Alexander during the taxable years, and to various partnership matters in which he participated. These the petitioner explains in substance as brotherly cooperation and mutual assistance, and contends that the checks represent only a small part of those actually issued by the partnership. In our opinion, some of the matters represented by the checks written by petitioner may be explained by the relationship and cooperation between the brothers, but the record by no means indicates that the number of checks written by petitioner is comparatively small. These checks on Alexander & Alexander, signed by petitioner, were brought into the case when petitioner's attorney started examination of them, as follows: "I have gone through the bank statements of Alexander & Alexander and I have pulled out certain checks that I noticed have been signed by Mr. Harley Alexander *235 after January 1942." The checks are then the subject of detailed testimony. But we can not say that these were the only checks on Alexander & Alexander signed by the petitioner. There may have been many others. Those placed in evidence do not, aside from some cattle transactions, amount to a very large total, but they do show various payments by and matters transacted by the petitioner for the ranch, not fully explained by the witness' view that they were the result of authority given or mutual help between the brothers. Since Moen was manager, perhaps neither Robert nor Harley either wrote a large number of checks. The evidence is that Moen wrote most of the checks, in general paid the bills, and that he was supposed to pay all the expense accounts, except cattle bought, "and probably feed that we bought and ordered." So the number of checks written by petitioner may well be as great as that written by Robert. In 1943 Alexander & Alexander sold for $25,050.39 cattle costing $13,059.69, but, aside from one check for $3,131.17 written by petitioner, the record does not indicate who sold the cattle, received the proceeds, or wrote checks as to cattle. As to authority given, the bank *236 where the partnership did business had no card authorizing Harley to sign checks. They usually dealt with Robert, who did his banking business there, while petitioner did so in another town. Considering the considerable number of the firms' checks signed by the petitioner, reason would indicate that the bank considered him still a member of the firm, since his signature for the firm was not authorized by card. Moen in November 1942 shipped cattle to Kansas City in the name of Harley Alexander. The explanation given by Robert Alexander was "force of habit." It is not convincing. The alleged new partnership had been in existence about ten months. The check for the cattle, $9,694.72, was made to and endorsed by Harley. Later, in October 1943, the petitioner bought cattle for Alexander & Alexander, signing check for $3,131.17. The explanation given was that Robert had bought the cattle but was absent and Harley received and gave the check. The check, however, in no way indicates that Harley was signing for Robert, but was merely "Alexander & Alexander" and beneath, "Harley Alexander." Even much later, in October 1944, petitioner bought cattle for $1,439.43, signing Alexander & Alexander's *237 check, in the same manner. This could hardly be force of habit more than two and one-half years after the purported partnership, unless he was a member of it. No explanation is given why petitioner purchased except that Robert said petitioner often did so for him, and that Robert had told him to buy some cattle. More significant to the issue than these large checks, in our view, is the matter of Mary's receipt of income from Alexander & Alexander. Cooperation between the brothers is no explanation on this point. Two checks were made in Mary's name, as distribution of profits, in the amount of $1,800 each, in August and September 1943; and in 1944 profit-distributing checks were made in her name, $2,000 in March, $3,000 in April. Yet all of these checks were signed by Alexander & Alexander by petitioner. Moreover, none of these checks was endorsed by Mary. They were deposited in a bank account in her name. Again, though $7,170.69 was deposited to her credit between the opening of her account on December 31, 1942, and September 22, 1943, of the six checks written thereon, only one was written by Mary, while three were written by the petitioner, one by Robert, and one by the banker. These *238 checks indicate that petitioner was handling this matter very largely, in the name of Mary. He testified, in fact, that he handled her part of it as a usual rule. It is difficult to see why, as late as 1943 and 1944, the petitioner would write the partnership-distribution checks to Mary, unless he was a partner in fact. Obviously, she or one of the other partners would be the logical one to write such checks if she was a partner and Harley was not. No evidence shows that either partner authorized Harley's check, and the bank had no card of authority to him. This has all of the appearance of a check by him as partner. Asked why he signed the $3,000 check to Mary (one of the distribution checks) petitioner's answer was: "She no doubt informed me that she needed the money." He also stated that she asked him several times to draw money for her. Why would Mary, if a partner, appeal to one who was not, for her partnership distribution? This is clear participation by him in the partnership, consistent only with his membership therein and indicative that he was merely giving to Mary his share of the partnership profits. This conclusion is strongly supported by the evidence as to use of the *239 funds from the partnership after they were placed in Mary's bank account. The partnership books show, in September and October 1944, loans of $1,000 and $4,000 from Mary. The $1,000 was repaid September 21, 1944, and on December 16, 1944, $4,000 was deposited in her bank account. Mary did not remember making the loan. Asked what she thought transpired, she answered: "Well, I think they needed the money and took it, took the money from me. I just happened to have some money in my account and Uncle Rob needed the money, so he took the money from me. He could have asked Dad for it, and Dad could have looked in my account and gotten it from me." She had earlier, referring to the loans, and to her father and uncle Robert, testified: "A. This would be a generality, but what I know that in this particular case, which probably happened or would have happened, is that Dad needed some money and I went over to the bank and saw that I had some money in the account. "Q. Now, wait a minute. Who needed money? The loan was made to Alexander & Alexander? "A. In that case it would be Uncle Rob, then, who needed the money; it all depends on whether Dad or Uncle Rob, either one of them, and I had *240 money in my account, and they would borrow money unbeknownst to me and put it in their account and use it, and the time came when they would put it in my account and pay it back and the chances are I didn't know of the transaction until I got home." No checks from Mary, for the loans, appear. Moreover, the $2,000 check on Mary's account, dated June 12, 1943, written by petitioner, appears not for her benefit, for though there was testimony that it was for the section of land, it can not be, since the petitioner, under the evidence, had paid $2 an acre or $1,280, and Mary, by the only check she wrote on her account, paid $2,686.05 on the land. At $6 an acre, the price under the evidence, or $3,840 for the section, her check was sufficient to complete payment, from which it appears the $2,000 did not in fact help pay for the land. Another check, $362.81, also by petitioner appears possibly to be interest, since it is to the same payee named as to the land. It appears from the above that the petitioner had control over Mary's funds. Such dominion over the partnership earnings, even after placed in Mary's account, indicates the income to be that of the petitioner. Robert could not remember *241 Mary ever signing a check on Alexander & Alexander, and none appears; and, as above seen, on her own account she signed only one, up to September 22, 1943. The petitioner brings out the fact that Mary signed with Robert the note for $7,210 on January 22, 1942, the proceeds of which were divided among Robert and petitioner. But Mary had, on her own note, borrowed for her father, and on the security of Alexander & Alexander cattle, $3,127.77 on May 16, 1941, long before any partnership with her is claimed, and the $7,210 note is used in part to liquidate the earlier note. The $7,210 note offers little to indicate partnership with Mary. Robert testified, as evidencing a partnership including Mary, that previous to Mary's coming in, the ranch was run as "Alexander Brothers" and changed to Alexander & Alexander "when she went in." The books for 1940-1941, however, show "Alexander & Alexander" as the heading, and under the evidence were prepared the latter part of 1941. All of these considerations lead us to the conclusion that the Commissioner is by no means shown to have erred in considering that the income should be taxed to petitioner. Mary did not participate in the earning. Her *242 only connection is an alleged transfer of a partnership interest by the petitioner. Though it is urged, as above seen, that petitioner did not write, comparatively, many checks or do a great deal, it is clear that he did far more than Mary did, for the partnership, for it is not contended that she did anything. He appears to have written checks probably as much as Robert. We can not, on this record, say that the Commissioner's conclusion against partnership, and that right to future income was transferred, was unfounded. Absent a partnership including Mary, petitioner's contention fails. Though we recognize fully that formality and writing is not necessary to partnership, we think that in this matter partnership is too much left dependent upon mere inference. No witness testified that partnership was intended. Petitioner continued to have too much to do with the partnership of which he had been a member, and had too much control over the profits thereof, as against her absence and lack of participation and his use of the partnership funds in her bank account, for him not to be regarded as having earned such partnership proceeds. We think he did, and merely allowed Mary, at his convenience, *243 to receive the income. The mere contention of transfer to Mary of an interest in $1,500 worth of machinery and the profit in some cattle, with the little support it has in the record, fails to convince us that the Commissioner's determination that he was taxable was wrong. We, therefore, conclude and hold that no error is shown in the determination of deficiency as to the income reported by Mary. The question with reference to Frances Alexander is not that of partnership, for none is claimed. It is the petitioner's contention, in effect, that he bought for her certain cattle and turned over to her the farming of certain rented lands, and that the income from such operations was that of his daughter. The respondent determined that the petitioner earned the income and argues that under the principle enunciated in Lucas v. Earl, 281 U.S. 111, petitioner performed the services involved and is taxable on the profits therefrom. The petitioner, contra, contends, citing among other cases Blair v. Commissioner, 300 U.S. 5, and Helvering v. Horst, 311 U.S. 112, that Frances was the owner of the property, therefore taxable upon the income, regardless as *244 to who received it. The burden is upon the petitioner, after the Commissioner's determination. The question, one of fact, is: Who earned the income? The years involved are 1943 and 1944. Frances became 15 years of age on September 21, 1943. From September 1943 until May 1945 she lived in Amarillo with Mary, except for vacations and week-end visits at home. We have studied with care the evidence adduced. The income was primarily from two sources, profits from sale of cattle, and profit from wheat raised. The wheat is only that harvested in 1944, no income from that source being involved as to 1943. We analyze the two sources of income separately. As to cattle, the petitioner in 1942 or 1943 purchased some cattle, which were branded by petitioner with a brand which was registered in the name of Frances. The petitioner prepared and filed Federal income tax returns for Frances for both 1943 and 1944. Frances signed the return for 1944, and petitioner signed her name by him to the return for 1943. The petitioner sold the cattle in both years, those sold in 1943 for $8,945 costing $4,526.70. Net income of $4,413.30 is reported on the return for 1943 but the source thereof is not indicated *245 on the return, except the printed generality: "Net profit (or loss) from business or profession." No income from anything other than cattle (as proved by other evidence) is shown on the return for 1943, though petitioner testified as to Frances' farming in 1943 he believed it was, and the Hansford County Agricultural Association showed Frances as farming in 1943 two tracts totaling 216 acres. If she did, the return and petitioner's work sheet as to 1943, fail to show it. No losses on grain crops are deducted from the cattle sales, nor any expenses deducted, for 1943. No deposit was made to Frances' credit until December 30, 1944, when $4,125 was deposited, from sale, as the deposit slip shows, of 3,000 bushels of wheat. Thus, it appears that she did not receive the profits of the cattle sold in 1943. The petitioner testified that he furnished the money for the cattle, branded them and ran them on the range, also that he collected his money from other sales. Asked why the bank account was not opened for Frances until 1944, he said: "She didn't have any money * * *. When I sold enough of them I got my money out and then I deposited the rest of the money to her"; also asked, as to cattle *246 sales: "* * * all of this was put in your account?" he answered: "Up until I got the money I put it in the bank out of the * * *"; and that he paid the expenses, through 1944. In brief, petitioner bought and sold some cattle, allegedly for Frances, but all she could or would receive was the profit, if any, and even that, as to cattle sales of 1943, she never in fact is shown to have received, for, as above seen, the first deposit (and indeed the only deposit shown) to her credit was from grain. The petitioner furnished the grain and feed for the cattle, aside from pasturage on the rented lands turned to Frances. In short, the petitioner, on the record, earned the proceeds of the sale of the cattle, and, so far as 1943 is concerned, she never even received that. Though it is shown that she helped petitioner drive cattle, the extent thereof does not appear, nor whether this was done as to the cattle claimed to be hers. No part of the cattle profits appear as earned by her. No bill of sale or other transfer of cattle to her was proven, and the record does not indicate that the cattle were purchased or sold in her name. Since the county records show that no real or personal property assessments *247 appear under the name of Frances Alexander, the cattle are not shown not to have been in her name (except as to brand) at any time. She had for 1943 no expense whatever, according to the return and the meagre record adduced. It is clear that as to the income reported for Frances for 1943, petitioner was the earner, and she not even the recipient. It is to be noted that the only deduction for either 1943 or 1944 is $900 for "machine hire" in 1944, so that the failure to deposit the $4,413,30, [6] cattle sales of 1943, to Frances' account is not explained by the petitioner's contention that he paid her expenses. Reinvestment of her funds is not shown. For 1944, the return, prepared by petitioner although signed by Frances, reported net income of $4,800.57, explained as follows: Profit on sale of 25 cattle sold, $1,486.75 (cost $1,432.50, sold for $2,919.25); grain sales $4,110; agricultural program payments $103.82; gross profits $5,700.57; expenses $900 (machine hire); net farm profit $4,800.57. Analyzing then the record as to 1944, with its record *248 of sale of wheat and cattle, we find petitioner buying and selling the cattle, but no deposit in Frances' name in 1944 of anything except the $4,125 from sale of 3,000 bushels of wheat; for that deposit, on December 30, 1944, was by the petitioner called the first deposit to Frances' credit, and as opening her bank account, also that prior thereto "she didn't have any money." It is possible that before the end of 1944 further money from the cattle was received by her account, but no such showing was made. On the contrary, though the evidence is not very definite, the petitioner was asked whether income from cattle sales as to Frances was put into his account, and (after intervening reference to the sale of grain and deposit in December 1944), the questioner came back to: "I am talking about the cattle sales." The answer was "Yes." We can not, on the record, find that any proceeds of cattle sales were received by Frances in 1944. On the record the only contribution to cattle production made by her was wheat pasturage furnished by the land turned to her by petitioner. Though she did some branding, nothing indicates that she branded the cattle bearing her brand. Petitioner testified on *249 the contrary that he did so. Included in services rendered to the petitioner, under the testimony, was helping him work cattle and brand, but this is shown done, as the other children did, for him from 1942 on, and not for herself. We regard, therefore, the wheat pasturage as the only connection between Frances and the profit from cattle. We, therefore, examine the situation as to wheat farming by Frances. In general, Frances helped the petitioner drill wheat, for about two weeks, though on what land is not shown. She did little plowing, though of course the wheat land had to be plowed. It is evident then that she did not "furnish the labor" for the farming ascribed to her. He furnished the seed and equipment. As to harvesting, he said "We hired all that done" and adds that she paid the expense of harvesting "the first crop." Since no income from wheat farming, and no expense or loss therefrom, was reported for 1943 for her, and since, for 1944, the only deduction taken was $900 for "machine hire," which apparently referred to harvesting, and since Frances had no money, the petitioner says, until the deposit of the $4,125 from 3,000 bushels of wheat December 30, 1944, it is clear that *250 she did not in fact pay the $900 expense - at least up to December 30, 1944; and no showing is made of expenses paid on December 30 or December 31. In this connection it is to be noted also that the petitioner testified that he kept records on Frances' operations, but produced only two work sheets, one each for 1943 and 1944. He had kept books he said, but, asked whether he had them, answered: "I don't know whether I have or not. I don't have them here." Summarizing this situation, as to both years and both cattle and wheat, we find that the only money shown ever reaching the bank account in the name of Frances is the $4,125 from wheat, the "first deposit" (and only one shown by the record) on December 30, 1944. Thus, it is not shown that she ever, in the taxable years or otherwise, received or even had deposited to her credit or invested for her any money from cattle. Frances did some work around the ranch, while she was at home during vacations from school, but nothing more than a ranchreared child might reasonably be expected to do, and obviously was by petitioner expected to do. What she did is not shown to result in the production of income, either from the cattle or the particular *251 land here involved. She is not shown to have written a check or actually received, or spent, any of the amounts received for cattle or grain. Making a profit from either cattle or wheat entails judgment and experience. No management of cattle or management or sale of wheat, by her, is shown. The production of income was, in our view, on the facts before us, not shown to be by Frances, a child of 15-16 years of age, away at school most of the time, but by the petitioner a rancher-farmer of experience as to both cattle and wheat. He received all cattle income, which is all of the income for 1943. She did not receive any of it. He had dominion and control of most if not all of the income. Though emancipation of Frances is suggested, it is not shown, and in any event she is not shown to have earned the income. We conclude and hold that the Commissioner is not shown to have erred in including the amounts in petitioner's income. Because of disposition of other issues by agreement, Decisions will be entered under Rule 50. Footnotes
*. Harley Alexander, Docket Nos. 16573, 18923, Maude Alexander, Docket Nos. 16574, 18924.↩
1. These rentals paid to Mary have not been added to the petitioner's income in the years here involved, and are, therefore, not in issue.↩
2. This is not the income tax report, but merely a page heading on books kept.↩
3. No explanation concerning the $1,000 discrepancy. The sum of $7,250.16 and $9,694.72 is $16,944.88.↩
4. Vice-president of First State Bank of Spearman.↩
5. The return contains no information concerning the source of the income other than the printed matter on the return, namely: "Net profit (or loss) from business or profession (from Schedule C (2))." Schedule C (2) is not filled in.↩
6. There is a $5 discrepancy between the $4,413.30 on the return and $4,418.30 on petitioner's work papers figuring the profit.↩